SLATER LAW GROUP APC
A Professional Corporation
MARK K. SLATER, SBN 129742
 mslater@slaterlawgrp.com
JUNYONG HUANG-STOWERS, SBN 307178
 jhuang@slaterlawgrp.com
33 New Montgomery Street, Suite 1210
San Francisco, California 94105
Telephone:  (415) 294-7700
Facsimile:  (415) 294-7763

Attorneys for Plaintiffs
PETER HILLARY
GEORGE HILLARY
ALEXANDER HILLARY

FILED
CLERK, U.S. DISTRICT COURT
8/18/20
CENTRAL DISTRICT OF CALIFORNIA
BY:  cs   DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

CV20-7739-SVW(PDx)

| | |
|---|---|
| PETER HILLARY, an individual; GEORGE HILLARY, an individual; and ALEXANDER HILLARY, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>BRON EVEREST PRODUCTIONS INC., a Canadian corporation; BRON STUDIOS INC., a Canadian corporation; BRON STUDIOS USA INC., a Nevada corporation; and IMAX CORPORATION, a Canadian corporation,<br><br>Defendants. | Case No.<br><br>REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL<br><br>**COMPLAINT FOR:**<br><br>(1) **BREACH OF CONTRACT;**<br>(2) **PROMISSORY ESTOPPEL;**<br>(3) **BREACH OF IMPLIED CONTRACT;**<br>(4) **QUANTUM MERUIT;** and<br>(5) **DECLARATORY RELIEF RE COPYRIGHT**<br><br>**DEMAND FOR JURY TRIAL** |

ORIGINAL

Plaintiffs Peter Hillary, George Hillary, and Alexander Hillary (collectively, the "Hillarys") hereby allege as follows:

## JURISDICTION AND VENUE

1. This action arises under section 201 of the Copyright Act and California common law. The jurisdiction of this Court is founded on 28 U.S.C. §§ 1331 and 1367.

2. Defendants are subject to personal jurisdiction in this Court based on continuous and systematic contacts with this judicial district. They produce and distribute movies, television shows, and other digital media content throughout the United States, including California, and maintain offices in Los Angeles, California. Furthermore, the agreements that give rise to this action ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (collectively, the "Agreements")[1].

3. Venue is further proper in this Court because ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓ Defendants actively participated in the negotiations for and performance of the Agreements, and induced the Hillarys to sign their respective Agreements. The Agreements were negotiated in, and the liability arose and the breach occurred in, Los Angeles County, California.

## PARTIES

4. Plaintiff Peter Hillary is, and at all relevant times was, a resident of New Zealand.

5. Plaintiff George Hillary is, and at all relevant times was, a resident of Australia.

6. Plaintiff Alexander Hillary is, and at all relevant times was, a resident of New Zealand.

7. The Hillarys are informed and believe, and thereon allege, that Defendant Bron Studios Inc. is, and at all relevant times was, a Canadian corporation doing business in Los Angeles County, California and with an office at 345 N Maple Drive #294, Beverly Hills, CA 90210.

---

[1] The Agreements ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

-1-

8. The Hillarys are informed and believe, and thereon allege, that Defendant Bron Studios USA Inc. (together with Bron Studios Inc., "Bron Studios") is, and at all relevant times was, a Nevada corporation qualified to do business in California and maintains an office at 345 N Maple Drive #294, Beverly Hills, CA 90210.

9. The Hillarys are informed and believe, and thereon allege, that Bron Everest (together with Bron Studios, "BRON") is, and at all relevant times was, a Canadian corporation doing business in Los Angeles County, California.

10. The Hillarys are informed and believe, and thereon allege, that Defendant IMAX Corporation ("IMAX") is, and at all relevant times was, a Canadian corporation qualified to do business in California and maintains an office at 12582 West Millennium Drive, Los Angeles, CA 90094.

## FACTUAL ALLEGATIONS

11. Plaintiff Peter Hillary is a world-renowned mountaineer, philanthropist, and writer. He has achieved two summits of Everest, an 84-day trek across Antarctica to the South Pole, and an expedition guiding astronaut Neil Armstrong to land a small aircraft at the North Pole. Peter Hillary is the son of mountaineer Sir Edmund Hillary who, along with Tenzing Norgay, were the first climbers to reach the summit of Mount Everest.

12. Plaintiffs George Hillary and Alexander Hillary are Peter Hillary's sons. They are accomplished climbers in their own right, and continue the family's legacy of mountaineering, exploration, and philanthropy.

13. IMAX is an entertainment technology corporation listed on the New York Stock Exchange. IMAX specializes in motion-picture technologies and large-format motion-picture presentations. Its revolutionary IMAX film provides viewers with immersive theatre experiences. IMAX has more than 1,500 IMAX theatres in over 80 countries and territories around the globe.

14. Bron Studios is a worldwide motion picture company which focuses on the creation, development, production, and financing of motion pictures, television, and digital media

content. Its roster of acclaimed releases includes top U.S. box office performer and Academy Award-winning film Joker.

15. Bron Everest is a single-purpose entity created by Bron Studios.

16. Peter Hillary's colleague Ben Webster ("Webster") had been in discussions with IMAX since approximately 2018 about making an IMAX documentary film of the Hillary family. As momentum was gained with IMAX in 2019, further progress was delayed because IMAX was in the process of hiring a new CEO.

17. After IMAX's new CEO settled in, IMAX agreed to proceed with the film, but on the condition that it must be made with BRON, and use Webster as the field director.

18. On August 28, 2019, Aaron Gilbert ("Gilbert"), CEO of Bron Studios, introduced himself and Bron Studios' Los Angeles team to the Hillarys in an email. Gilbert stated that Bron Studios looked forward to working on the IMAX documentary with the Hillarys, and that the Los Angeles team would be the Hillarys' main point of contact going forward.

19. In response, Peter Hillary wrote that the family was very excited to start the project, and that "[a]s soon as our agreements are finalised, George, Alexander and I will be able to rearrange our schedules for the coming year – George will have to take leave and possibly resign from his financial services firm, Alexander will defer studies and I will have to withdraw from my work as a speaker and adventure travel operator. So we will be fully committed."

20. Gilbert responded: "We understand well and feel the sense of responsibility to insure this film captures your families [sic] history."

21. The Hillarys relied on what they were told, and immediately started negotiating the terms of their contract for the documentary with Bron Studios.

22. From the beginning, both IMAX and Bron Studio have represented to the Hillarys repeatedly that they would co-produce the documentary, which would be made in two formats: a standard movie film and an IMAX film.

23. The IMAX film would include George and Alexander's spectacular climb of Ama Dablam and Mount Everest. This would be unprecedented. The use of high altitude performance

helicopters and drones would allow the viewers to look down at the young Hillarys, according to the film treatment[2], with a bird's eye view, as they climbed the sheer faces and exposed ridges of the mountains.

24. Bron Studios, however, required that the Hillarys start filming before the contract was finalized.

25. Sometime around early October 2019, Bron Studios asked that the Hillarys travel to Nepal to start filming, despite contract negotiations were still ongoing.

26. In reliance on the reputation and encouraging representations of IMAX and Bron Studios, the Hillarys started preparing for their trip. As stated in Peter Hillary's email to Gilbert in August, Peter and George left their jobs, and Alexander deferred his studies, in order to focus on filming.

27. On or around October 14, 2019, the Hillarys departed from New Zealand and Australia to Nepal, and met up with Bron Studios' filming crew and representative in the city of Kathmandu in Nepal, where they made last minute preparations before flying from Kathmandu into the mountains of the Himalayas and the Khumbu region. Once they met, the seven-week filming was immediately underway, lasting from October 15, 2019 to November 30, 2019.

28. In the film treatment Bron Studios sent to the Hillarys and its Nepal crew on or around October 15, 2019, Bron Studios described shots for the IMAX film in detail, and attached background information of IMAX for the crew to better understand the technology behind an IMAX film.

29. According to the film treatment, the documentary would start by showing the third generation Hillarys, George and Alexander, trekking in the mountains with their father Peter Hillary and meeting old Sherpa friends of their father before going on to learn how to climb Himalayan mountains at Ama Dablam, a majestic mountain south of Mount Everest known for its soaring summit of 22,349 feet; then, the film would move to New Zealand, introducing the history and influence of the Hillary family and their charitable work in Nepal's Khumbu Valley; and

---

[2] A film treatment is a detailed summary of a film, which includes all key elements of the film such as important scenes, main characters, and crucial plot points.

-4-

HILLARYS' COMPLAINT AGAINST BRON AND IMAX

finally, the Hillarys would return to Nepal, with George and Alexander climbing Mount Everest, with support from their father Peter Hillary, in continuance of the family's legacy.

30. In order to film for both flat screen and IMAX screen at the same time, Bron Studios often required the Hillarys to repeat the same scene, first for shooting with regular lenses, then for shooting with special IMAX lenses from various angles.

31. The filming was made difficult and dangerous due to IMAX's rigid requirements for their shots.

32. Throughout their time in Nepal, Bron Studios repeatedly informed the Hillarys that the film must be made to IMAX's standard. All footage filmed in Nepal was sent to IMAX in Los Angeles for review approximately every two weeks (when the crew left the town of Thame, when the crew was in the town of Deboche, and when the crew returned to Kathmandu). IMAX would provide extensive comments on the shots, which were communicated by Bron Studios and often required the crew to refilm the scenes. The exacting requirements of making an IMAX film made filming slow, and the Hillarys had to repeat shots on Ama Dablam at high elevations and in very hazardous conditions, often with thousands of feet of space directly beneath them.

33. IMAX's rigid requirements and the need for repeated takes did not change even when undertaking very risky shots. During their ascent of Ama Dablam, a helicopter fly-over shot of George and Alexander standing on the edge of a huge cliff at Camp Two at 20,000 feet was required. In order to accommodate the shot, the two camped on a granite pinnacle with a drop of 5,000 feet in order to accommodate the shot. Due to the difficulties of filming from a helicopter, George and Alexander were required to stay on the pinnacle for two days, facing that 5,000-foot drop, while multiple shots were taken from the helicopter, before the footage was deemed to be of a standard acceptable to IMAX.

34. As the film treatment accurately described, George and Alexander were "risking their lives," to climb Ama Dablam while meeting IMAX's filming requirements.

-5-

HILLARYS' COMPLAINT AGAINST BRON AND IMAX

35. Finally, when George and Alexander summited Ama Dablam, Bron Studios instructed the two to point to the summit of Mount Everest, and to say "that's our next challenge," signaling the segue to the next stage of the film.

36. Bron Studios' Chief Operating Officer Steven Thibault ("Thibault") informed Peter Hillary in a phone call that $1.5 million of the documentary's $6 million budget was spent in Nepal between October and November 2019.

37. The Hillarys' contract negotiation with Bron Studios continued during the early stages of filming in the Himalayan mountains, as requested by Bron Studios' Los Angeles team. Finally, on or around October 21, 2019, almost one week after filming began, the Hillarys signed the Agreements while they were filming in a remote village at 13,000 feet altitude near Mount Everest.

38. ███████████████████████████████████████████████████████████████████████████, a single-purpose entity created by Bron Studios.

39. The production of the documentary was divided into four periods according to ███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
██████████  ██████  ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
████████████ (emphasis in original).

40. ██████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████,

---

[3] Each of the Hillarys and Bron Everest were ████████████████████████████████
████████████

[4] "Pay or play" is a term commonly used in an artist's contract, where the producer commits to pay the artist the negotiated fees even if the producer later decides that the artist's services won't be required.

-6-

1
2  41. ▮
3  ▮
4  42. ▮
5  ▮
6  ▮
7  ▮
8  ▮
9  ▮

10  43.  After returning from Nepal, the Hillarys and Thibault continued to discuss the next step in filming, including climbing gear purchases and plane tickets reservations.

12  44.  Ivan Hughes, BRON's representative and on-site producer in Nepal, wrote to Peter Hillary on December 9, 2019 praising the family, stating that he "got all sorts of amazing footage and are definitely off to a great start in the production."

15  45.  On January 11, 2020, Webster emailed Peter Hillary and Thibault that IMAX had decided to put the *Everest 2020* production on hold for two weeks because IMAX had just hired a new head of documentaries. Webster suggested alternative dates for filming in Peter Hillary's New Zealand home between February 7 and February 14, 2020.

19  46.  Thibault wrote to Peter Hillary and Webster on January 21, 2020 on behalf of BRON, stating that "we will always protect the Hillary Brand" and that "BRON is obviously continuing to make good on our contractual obligations."

22  47.  However, on January 27, 2020, Bron Everest's attorney sent a letter to the Hillarys, terminating the Agreements without cause. In the letter, Bron Everest stated that it had not entered into a co-production agreement with IMAX, but insisted that Bron Everest is entitled to all rights to the work that the Hillarys had done for the production, including the footage in Nepal during the First Production Period, ▮. At around the same time, Bron Studios' Los Angeles-based executive and Thibault, apparently speaking for Bron Everest,

-7-

HILLARYS' COMPLAINT AGAINST BRON AND IMAX

1 informed Peter Hillary in a call that the Agreements were terminated, and that the Hillarys would
2 not receive further payments from BRON.

3     48. █████████████████████████████████
4 ████████████████████████████████████████████
5 ████████████████████████ (emphasis added).

6     49. Strangely, BRON insisted that Principal Photography had not commenced, even
7 though the Hillarys and BRON's camera crew spent seven weeks in Nepal filming the Hillarys'
8 climb of Ama Dablam, completing the opening scene in the film treatment.

9     50. To date, Bron Everest has only paid the Hillarys $20,000 each.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract—Against Bron Everest)

12     51. The Hillarys hereby reallege and incorporate by reference each and every allegation
13 contained in paragraphs 1 through 50, inclusive, of this Complaint, as though fully set forth herein.

14     52. The Hillarys and Bron Everest entered into the valid and enforceable Agreements,
15 ████████████████████████████████████████████
16 ████████████████████████████████████████████

17     53. The Hillarys have performed all duties and obligations required of them under the
18 Agreements, except those duties and obligations which they were excused from performing.

19     54. No performance owed to the Hillarys by Bron Everest was excused under the
20 Agreements.

21     55. Bron Everest expressly waived ████████████████████████
22 ████████████████████████ by continuing filming in Nepal after the
23 Hillarys signed the Agreements on October 21, 2019 despite knowing it had not secured a contract
24 from IMAX, and by representing to the Hillarys that it would "make good on our contractual

---

[5] "Principal photography begins after pre-production ends, but takes place before post-production... 'pre-production'...means the tasks that are involved in setting up a movie prior to the start of principal photography. *Am. Fed'n of Musicians of the U.S. and Can. v. Paramount Pictures Corp.*, No. CV 15-4302, 2016 WL 3693746, at *6, fn. 5 (C.D. Cal. Jun. 15, 2016), *rev'd on other grounds*, 903 F.3d 968 (2018).

-8-

obligations" and "always protect the Hillary Brand" after learning IMAX's intent to put the *Everest 2020* production on hold and again with knowledge that it had not secured a co-production agreement from IMAX.

56. The Hillarys relied on Bron Everest's statements to their detriment. George and Peter left their jobs, and Alexander deferred his studies, in order to focus on the production. The Hillarys traveled to Nepal and engaged in the seven-week filming with BRON, all while risking their lives. Bron Everest cannot rescind its waiver.

57. BRON further breached ▮▮▮▮ by wrongfully terminating the Agreements without cause on January 27, 2020, after the commencement of Principal Photography. This termination came months after the Hillarys had spent seven weeks filming in Nepal and completed the First Production Period.

58. As a direct and proximate result of Bron Everest's breach of the Agreements, as herein alleged, the Hillarys have suffered damage in an amount to be determined according to proof at trial, but in no event less than $60,000 for each of the three Agreements, or a total of $180,000.

WHEREFORE, the Hillarys pray for judgment against Bron Everest as hereinafter set forth in the Prayer.

## SECOND CLAIM FOR RELIEF

### (Promissory Estoppel—Against Bron Studios and IMAX)

59. The Hillarys hereby reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 58, inclusive, of this Complaint, as though fully set forth herein.

60. After months of discussion of a documentary film about their family with the Hillarys, IMAX represented to them that it would co-produce the film with BRON.

61. Further, during the Hillarys' filming with BRON in Nepal, the IMAX requirements and periodic feedback on the footage meant that there were many repeated shots of the Hillarys despite the hazardous filming conditions in Ama Dablam.

62. It was reasonably foreseeable to IMAX that the Hillarys would rely on its

representations, concluding that IMAX had entered into a co-production agreement with BRON. This is because the Hillarys had no other way to verify the existence of a contract between IMAX and BRON. Even though IMAX knew no such agreement existed, it nevertheless led the Hillarys to believe that it had agreed to produce the documentary with BRON, and induced them into signing the Agreements with Bron Everest.

63. Reasonably and foreseeably, the Hillarys relied on IMAX's representations to their detriment. They negotiated and executed the Agreements with BRON ███████████ ████████████████████████████████████████████████████████ ███████████████; they left their jobs and delayed their studies; and completed a seven-week filming in Nepal with BRON.

64. After the Hillarys signed the Agreements with BRON, IMAX renegaded and terminated production, and it turned out that IMAX had never entered into a co-production agreement with BRON. As a direct and proximate result of the Hillarys' reliance on IMAX's promise, the Hillarys sustained damage in the amount according to proof at trial, but in no event less than $60,000 for each of the three Agreements, or a total of $180,000.

65. Bron Studios represented to the Hillarys that it had secured a co-production agreement with IMAX. On August 28, 2019, Gilbert of Bron Studios wrote to the Hillarys that the film of the Hillary family would proceed and would be for IMAX, and acknowledged that the Hillarys would need to leave their jobs or defer their studies in order to make the film. Bron Studios then sent the Hillarys the film treatment that included details of IMAX shots and background information of IMAX films; it repeatedly stated to the Hillarys during filming in Nepal that the shots must be up to IMAX's standard, and required the Hillarys to redo multiple shots because they were not to IMAX's standard.

66. At the time these representations were made, Bron Studios knew that BRON had not secured a co-production contract with IMAX. It knew or should have known that the Hillarys would reasonably rely on its statements, because the Hillarys had no way of verifying whether BRON and IMAX had entered into a separate agreement. Bron Studios was also engaging in

contract negotiations with the Hillarys for the IMAX documentary, and therefore knew that the Hillarys would rely on its representations when entering the contract. Nevertheless, Bron Studios continued to lead the Hillarys to believe that the film was co-produced with IMAX, and induced the Hillarys into signing the Agreements with Bron Everest.

67. Reasonably and foreseeably, the Hillarys relied on Bron Studios' representations to their detriment. Peter and George left their jobs and Alexander deferred his studies; the Hillarys travelled to Nepal to participate in a seven-week filming assignment; and signed the Agreements with Bron Everest ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

68. BRON had not secured the IMAX contract as it had represented to the Hillarys. As a direct and proximate result of the Hillarys' reliance on BRON's promise, the Hillarys sustained damages in the amount according to proof at trial, but in no event less than $60,000 for each of the three Agreements, or a total of $180,000.

WHEREFORE, the Hillarys pray for judgment against Bron Studios and IMAX as hereinafter set forth in the Prayer.

### THIRD CLAIM FOR RELIEF

### (Breach of Implied Contract—Against Bron Studios)

69. The Hillarys hereby reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 68, inclusive, of this Complaint, as though fully set forth herein.

70. On August 28, 2019. Bron Studios asked the Hillarys to participate in an IMAX documentary filming in Nepal for a fee, which included Peter trekking into the mountains with his sons, and George and Alexander learning to climb a Himalayan mountain on Ama Dablam, and ultimately reaching the summit of Ama Dablam. This was, according to Bron Studios, a part of a $6 million documentary film about the Hillary family.

71. The Hillarys agreed, and traveled to Nepal for a seven-week long filming with Bron Studios' crew. Despite difficulties in making an IMAX film while climbing the mountain, the Hillarys successfully completed the filming with Bron Studios in Nepal.

72. Bron Studios and the Hillarys entered into an implied contract, whereby the Hillarys agreed to participate in Bron Studios' IMAX documentary, and Bron Studios agreed to pay the Hillarys.

73. The Hillarys have performed all duties and obligations required of them under the implied contract, including by completing a seven-week filming in Nepal, except those they are excused from performing.

74. No duties owed to the Hillarys by Bron Studios is excused.

75. Bron Studios breached the implied contract by refusing to pay the Hillarys for their filming in Nepal.

76. As a direct and proximate result of Bron Studios' breach, the Hillarys are damaged in an amount according to proof at trial, including, but not limited to, at least $80,000 to each of the Hillarys, and the loss opportunities such as endorsement, promotional, advertisement, and speaking engagements that would necessarily follow the release of the documentary.

WHEREFORE, the Hillarys pray for judgment against Bron Studios as hereinafter set forth in the Prayer.

## FOURTH CLAIM FOR RELIEF

### (Quantum Meruit—Against Bron Studios and IMAX)

77. The Hillarys hereby reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 76, inclusive, of this Complaint, as though fully set forth herein.

78. Bron Studios and IMAX requested the Hillarys services—to participate in an IMAX documentary of the Hillary family co-produced by BRON and IMAX. This included a seven-week filming in Nepal. where George and Alexander were asked to complete the difficult task of climbing Ama Dablam while being filmed.

79. The Hillarys agreed and participated in the Nepal filming, with George and Alexander successfully summitting Ama Dablam.

80. Bron Studios and IMAX obtained "all sorts of amazing footage" from the seven-week filming.

-12-

HILLARYS' COMPLAINT AGAINST BRON AND IMAX

81. Bron Studios and IMAX have not paid the Hillarys for their services rendered.

82. The reasonable value of the services provided by the Hillarys is at least $80,000 each, not including opportunities such as endorsement, promotional, advertisement, and speaking engagements that would necessarily follow the release of the documentary.

83. Accordingly, the Hillarys are entitled to the reasonable fair market value of their services performed for Bron Studios and IMAX.

WHEREFORE, the Hillarys pray for judgment against Bron Studios and IMAX as hereinafter set forth in the Prayer.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief re Copyright—Against All Defendants)

84. The Hillarys hereby reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 83, inclusive, of this Complaint, as though fully set forth herein.

85. Bron Everest breached the Agreements by refusing to pay the Hillarys, and by wrongfully terminating the Agreements without cause after Principal Photography had begun.

86. Despite its breach, Bron Everest insisted that it was entitled to all rights to the work done by the Hillarys for the production, including the footage in Nepal during the First Production Period, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

87. The Hillarys have informed Bron Everest that they are the exclusive owners of the copyright to the footage pursuant to 17 U.S.C. § 201(a).

88. Bron Studios and IMAX are not parties to the Agreements, but they nevertheless seek copyright to the footage filmed in Nepal and on Mount Ama Dablam.

89. The Hillarys, through their counsel, have informed Bron Studios and IMAX that they have no rights to the footage.

90. An actual and justifiable controversy now exists between the parties concerning their respective rights and interests in the Hillarys' work performed in connection with the documentary, including the footage filmed in Nepal and on Ama Dablam, as well as their rights and duties under the Agreements.

91. The Hillarys desire a judicial determination of their rights and obligations, declaring that they are the exclusive owners of the copyright to the work done in connection with the documentary, including the footage filmed in Nepal and on Ama Dablam, and that Bron Everest, Bron Studios, and IMAX have no rights in the work and footage.

WHEREFORE, the Hillarys pray for a judicial declaration as hereinafter set forth in the Prayer.

**PRAYER**

1. For damages in an amount to be proven at trial;
2. For a judgment declaring that Bron Everest, Bron Studios, and IMAX are not entitled to any rights to the work done by Hillarys in connection with the production of *Everest 2020*;
3. For a judgment declaring that the Hillarys are the exclusive owners of the copyright to the work in connection with the documentary, including the footage filmed in Nepal and on Ama Dablam.
4. For pre-judgment and post-judgment interest at the maximum rate allowed by law;
5. For attorneys' fees and costs of suit herein; and
6. For such other and further relief as the Court deems just and proper.

Dated: August 14, 2020

SLATER LAW GROUP APC

By: _____
Mark K. Slater
Junyong Huang-Stowers
Attorneys for Plaintiffs
Peter Hillary
George Hillary
Alexander Hillary

-14-
HILLARYS' COMPLAINT AGAINST BRON AND IMAX